IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORTH WORTH DIVISION

| | |
|---|---|
| IPSEN BIOPHARM LTD., § § Plaintiff, § § v. § § GALDERMA LABORATORIES, L.P., § § Defendant. § § | CIVIL ACTION NO. 4:22-cv-00662 |

**COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff Ipsen Biopharm Ltd. ("Ipsen"), alleges as follows:

**INTRODUCTION**

1.  This is an action for injunctive relief in which Ipsen seeks an order to maintain the status quo and prevent Defendant Galderma Laboratories, L.P. ("GLP") from misappropriating Ipsen's confidential and trade secret information in relation to QM-1114, an experimental, liquid formulation preparation derived from Botulinim toxin A (USAN: relabotulinutoxin-A) for the treatment of facial glabellar lines (frown) and lateral canthal lines (crow's feet). Ipsen is the owner of all rights and intellectual property in QM-1114, which is being developed under license by GLP, the U.S. arm of Galderma S.A. ("GSA"), a Swiss company. Ipsen and GSA are embroiled in an arbitration in Belgium. In the midst of the arbitration, GLP, which is a Texas limited partnership and not a party to the arbitration, announced that it intends to use Ipsen's trade secrets to make unauthorized filings with the United States Food and Drug Administration ("FDA") and seek approval in its own name. GSA's threats constitute threatened misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 and Texas state law. Ipsen seeks a limited injunction to prevent GSA from making such disclosures prior to final resolution by the arbitral panel.

1

## THE PARTIES

2. Plaintiff Ipsen is a company organized under the laws of the United Kingdom with its principal place of business at Ash Rd N, Wrexham LL13 9UF, United Kingdom. Ipsen is in the business of developing, manufacturing, and marketing pharmaceutical products, particularly in the field of neurosciences.

3. Defendant GLP is a Texas limited partnership registered in the State of Texas with its principal place of business at 14501 North Freeway, Fort Worth, Texas 76177. GLP's registered agent for service of process is CCS Global Solutions, Inc. located at 3610-2 North Josey Lane, Suite 223, Carrollton, Texas 75007. Upon information and belief, GLP's partners are Galderma Limited, LLC and Galderma General, LLC, both of which are incorporated and registered to do business in Delaware with a principal place of business at 14501 North Freeway, Fort Worth, Texas 76177.

4. GLP is a U.S.-based subsidiary of Galderma S.A. ("GSA"), a Swiss pharmaceutical company specializing in dermatological treatments and skin care products. GLP operates as GSA's U.S. authorized agent for regulatory filings and submissions to the FDA.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction over Ipsen's cause of action for misappropriation of trade secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836(b) & (c)).

6. On information and belief, the Court also has jurisdiction over the subject matter of this action because there is diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332(a) and the amount in controversy exceeds $75,000, exclusive of interests and costs. Ipsen is a citizen of a foreign state, the United Kingdom. The citizenship of GLP, a limited partnership, is determined by the citizenship of each partner of the entity. *Carden v. Arkoma Assocs.*, 494 U.S.

185, 195-96 (1990). Upon information and belief, GLP's partners are Galderma Limited, LLC and Galderma General, LLC, which are incorporated in Delaware and have a principal place of business at 14501 North Freeway, Fort Worth, Texas 76177. The citizenship of a limited liability company is also determined by the citizenship of each member of the entity. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079 (5th Cir. 2008). Upon information and belief, Galderma Services, Inc. is the sole member of both Galderma Limited, LLC and Galderma General, LLC. As a corporation, Galderma Services, Inc. is deemed to be a citizen in (a) every state where it is incorporated; and (b) the state where it has its principal place of business. 28 USC § 1332(c)(1). Galderma Services, Inc. is a corporation incorporated and registered to do business in Delaware with a principal place of business at 14501 North Freeway, Fort Worth, Texas 76177. Accordingly, for purposes of evaluating diversity of citizenship, Galderma Services, Inc., and by extension GLP, is a citizen of Delaware and Texas.

7. The Court has supplemental jurisdiction over Ipsen's other causes of action arising under state law pursuant to 28 U.S.C. § 1367 because the claims are so closely related to Ipsen's claim under the Defend Trade Secrets Act as to form part of the same case or controversy.

8. This Court has personal jurisdiction over GLP because GLP is a partnership organized under Texas law, is registered to do business in the State of Texas and has appointed a registered agent for service of process in the State of Texas. Moreover, GLP maintains a place of business in the State of Texas and sells and distributes pharmaceutical, aesthetic, and/or dermatological products through the United States, including Texas and/or has engaged in systematic and continuous business contacts within the State of Texas.

9. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because GLP resides in the Northern District of Texas.

## **FACTUAL ALLEGATIONS**

**A. Background**

10.     Since 2007, Ipsen and GSA have been partners in the field of aesthetic and dermatology products.  Over the course of their partnership, Ipsen and GSA have successfully developed and marketed two prescription drug products containing botulinum toxins worldwide and in Europe under the brand names Dysport® and Azzalure®, respectively.

11.     Biological products (or "biologics") are a diverse category of products and are generally large, complex molecules that are often produced through biotechnology in a living system such as a microorganism, plant cell, or animal cell.

12.     Botulinum toxin is one of the most poisonous biological substances known.  It is a neurotoxin produced by the bacterium Clostridium botulinum that exists in eight forms (A, B, C1, C2, D, E, F and G).  The toxin causes the disease botulism.  Botulinum toxin A is produced in sterile form for aesthetic and therapeutic uses.

13.     Pursuant to their partnership, Ipsen and GSA have been working together to develop and, upon regulatory approval, manufacture and market a new liquid form of Botulinum toxin type A, known as QM-1114 (USAN: relabotulinumtoxinA).

14.     QM-1114 is delivered by injection into muscle tissue, with a proposed indication of temporarily improving the appearance of moderate to severe glabellar lines (located between the eyes and/or eyebrows) associated with corrugator and/or procerus muscle activity, and/or moderate to severe lateral canthal lines (LCL) associated with orbicularis oculi activity in adults 18 years and older.

**B. The QM Agreement**

15. On July 9, 2014, Ipsen and GSA entered into agreement for the purpose of developing, manufacturing, and/or selling QM-1114 (Botulinum Toxin Type A), in various jurisdictions, including the United States ("QM Agreement").

16. GLP is not a signatory to the QM Agreement.

17. Under the QM Agreement, GSA assigned to Ipsen all intellectual property and proprietary information covering QM-1114, including all existing and future research, development, manufacturing, selling and promoting rights in the United States and certain other jurisdictions ("Licensed Territory").

18. Under the QM Agreement, GSA was appointed as Ipsen's exclusive distributor and marketing partner for a certain field of use in the Licensed Territory. GSA was also tasked with preparing and submitting applications for the regulatory approval of QM-1114 on behalf and in the name of Ipsen. Under the QM Agreement, neither GSA, GLP, nor their affiliates are authorized to seek regulatory approval for the covered QM-1114 products on their own behalf or in their own names in the Licensed Territory including the United States. They can do so only with the express approval of Ipsen and only on behalf and in the name of Ipsen.

19. The QM Agreement provides that Ipsen owns all regulatory approvals, submissions, and issued certificates, together with all data, information, files developed, gathered, and drafted by Galderma, which includes GSA and Defendant GLP.

20. The proprietary information, data, and know-how concerning QM-1114 in the Licensed Territory, which have been assigned to Ipsen under the QM Agreement, are highly valuable to Ipsen. Indeed, Ipsen paid GSA 10 million Euros for the rights to the assigned intellectual property concerning QM-1114.

21. To protect Ipsen's intellectual property rights concerning QM-1114, the QM Agreement provided that all information related to the agreement and the performance under it would be kept confidential by the parties, except in certain limited circumstances not at issue here.

### C. GLP's Draft QM-114 Regulatory Application Contains Ipsen's Trade Secrets

22. To formally request approval to market a biologic drug like QM-1114 in the United States, an applicant or sponsor must submit a Biologics License Application ("BLA") to the FDA.

23. The purpose of a BLA is to submit documentation that demonstrates the safety and efficacy of the biologic for which a marketing application is being sought. In addition to safety and efficacy data, information regarding Chemistry, Manufacturing, and Control is also submitted. BLAs are submitted in a format known as the Common Technical Document ("CTD"). The CTD is a lengthy and multipart application organized into the following five modules.

- Module 1: Administrative Information;
- Module 2: Summaries of Modules 3-5 (commonly known as the Expert Report)
- Module 3: Quality (containing Chemistry, Manufacturing, and Control data);
- Module 4: Nonclincial Study Reports; and
- Module 5: Clinical Study Reports.

24. These modules contain comprehensive information about the safety, purity, and potency of the biologic product ascertained during the development process. These modules include vast data including the Chemistry, Manufacturing, and Control information, as well as non-clinical pharmacology and toxicology studies, human pharmacokinetics and bioavailability studies, clinical data, and labeling information about the biologic substance and product.

25. Once a BLA is approved by the FDA, the sponsor or applicant is granted a license for the biological product, which permits its introduction into interstate commerce.

26. In the course of the Ipsen-GSA partnership to develop, manufacture, and market QM-1114, Defendant GLP prepared a draft BLA for the QM-1114 product (the "QM-1114 BLA"), portions of which it transmitted to Ipsen for its review and approval.

27. The draft QM-1114 BLA comprises thousands of pages of Ipsen's proprietary information, data, and know-how about QM-1114, including, for example:

- A description of the chemical structure, primary (sequence) and secondary and tertiary subunit structure, molecular weight, and molecular formula of QM-1114;

- Analytical testing and characterization performed, which may include, amino acid sequence analysis, high-performance liquid chromatography ("HPLC"), mass spectroscopy, detection of product related proteins, detection of host cell proteins and DNA, potency and structuring testing of QM-1114;

- An identification of all raw materials and reagents used in the manufacture of QM-1114;

- Flow charts of the manufacturing process along with detailed descriptions of any raw material sources, cellular sources, equipment, batch records and results;

- In-process controls, such as those used throughout fermentation, harvesting, and purification;

- A description and documentation of the validation studies for the manufacturing process (cell growth expression, harvesting, purification, formulation, and sterilization processes);

- Non-clinical pharmacology and toxicology studies and related data; and

- Related clinical data.

28. Under the QM Agreement, the information, data, and know-how contained in the draft QM-1114 BLA belongs to Ipsen and are Ipsen's trade secrets.

29. Upon review of the draft QM-1114 BLA, Ipsen informed GLP and GSA that Ipsen disagreed and had concerns about certain testing methods supporting the proposed BLA submission, and the sufficiency of Chemistry, Manufacturing, and Controls sections of the BLA.

30. In a series of communications between July 2, 2021 and July 16, 2021, Ipsen informed GSA and GLP that it would not authorize the submission of any regulatory applications concerning QM-1114 globally, including with the FDA, due to certain disagreements about the contents of the BLA and divergent views over the regulatory submission strategy.

31. GLP cannot obtain approval for the draft QM-1114 BLA without using and incorporating Ipsen's trade secrets.

32. GSA initiated a request for arbitration before the International Chamber of Commerce against Ipsen raising allegations pertaining to the QM-1114 product ("ICC Arbitration Proceeding"). Arbitrators were appointed in the fourth quarter of 2021.

33. Defendant GLP is not a party to the ICC Arbitration Proceeding.

34. Ipsen intends to fully defend and vindicate its rights against GSA's allegations before the ICC.

35. To date, the ICC Arbitration Proceeding has not been resolved and is still pending. The arbitral tribunal in that proceeding is expected to render a final decision in or around September 2023.

**D. GLP Threatens Unauthorized Disclosure and Use of Ipsen's Trade Secrets**

36. Despite Ipsen's unambiguous express statements refusing to authorize GSA or GLP to submit the draft QM-1114 BLA containing Ipsen's proprietary information and intellectual

8

property to the FDA, and the pendency of the ICC Arbitration, just last month GSA and GLP informed Ipsen that they nevertheless intend to submit the draft QLM-1114 BLA to the FDA in September 2022 in the name of GLP.

37. In an email dated July 4, 2022, GSA informed Ipsen of its intent to submit the QM-1114 BLA to the FDA on our around mid-September 2022, followed by the relevant regulatory submissions in Canada, Australia, Europe, and other jurisdictions.

38. GLP's threatened submissions contain Ipsen's proprietary information, data, and know-how concerning the QM-1114 product. If GLP proceeds with submission, Ipsen's trade secrets will be disclosed to the FDA without Ipsen's authorization.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS
## IN VIOLATION OF THE DEFEND TRADE SECRETS ACT,
## 18 U.S.C. § 1836(b) *ET SEQ.*

39. Ipsen re-alleges and incorporate Paragraphs 1 through 38 as if fully set forth herein.

40. The proprietary information, data, and know-how contained in the draft QM-1114 BLA, including information concerning the scientific research and development of the QM-1114 biologic product, constitute Ipsen's trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b) *et seq*. Over the course of preparing the QM-1114 BLA, GLP came into possession of Ipsen's trade secrets.

41. The aforementioned proprietary information is intended for use in seeking FDA approval of the QM-1114 BLA, which if approved, would be marketed in interstate commerce.

42. This information derives independent economic value by not being accessible, through proper means, to competitors who can profit from its use or disclosure. The proprietary information, data, and know-how concerning the QM-1114 contained in the QM-1114 BLA is not readily available to the public.

43. Development of a novel biologic product like QM-1114 for approval in the United States is an extremely expensive and lengthy process. Ipsen has expended significant sums, both in financial and human resources, to support GSA and have the proprietary information protected, which is of great value to any competitor.

44. Ipsen has taken reasonable measures under the circumstances to maintain the secrecy of this information. In particular, the QM Agreement was intended, among other things, to protect trade secrets from unauthorized use or disclosure to any third parties. It includes a clear confidentiality provision preventing GSA from disclosing to any third party the proprietary information, data, and know-how concerning QM-1114.

45. GLP knew or had reason to know that Ipsen considered its proprietary information to be trade secrets.

46. GLP knew or had reason to know that it had obtained Ipsen's trade secrets under circumstances giving rise to an express duty to maintain the secrecy of the trade secrets and limit the use or disclosure of the trade secrets.

47. GLP threatens to imminently misappropriate Ipsen's trade secrets on or around September 2022 by seeking to file a BLA with the FDA, which contains Ipsen's trade secrets, without Ipsen's consent and notwithstanding Ipsen's express withholding of authorization due to concerns over the content of the BLA.

48. GLP's conduct in this manner is both willful and malicious.

49. GLP's unauthorized disclosure of Ipsen's trade secrets to the FDA through the QM-1114 BLA submission will cause irreparable harm to Ipsen, including: the loss of Ipsen's contractual right of control over the QM-1114 BLA, including the timing and scope of the BLA and other communications about it with the FDA; possible adverse decisions from the FDA

approval process arising from Ipsen's inability to exercise its right of control over the submission process; the unauthorized use and disclosure of Ipsen's proprietary information, data, and intellectual property for GLP's and GSA's benefit; and the potential of serious reputational harm and loss of goodwill arising from a possible backlash by the public, customers, and investors against any appearance of a violation of Ipsen's well-publicized policies and practices.

50. GLP's threatened unauthorized disclosure and use of Ipsen's trade secrets warrant injunctive relief and may further entitle Ipsen to compensatory damages.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS
## IN VIOLATION OF TEX. CIV. PRAC. & REM. CODE, CH. 134A

51. Ipsen re-alleges and incorporate Paragraphs 1 through 50 as if fully set forth herein.

52. The proprietary information, data, and know-how contained in the draft QM-1114 BLA, including information concerning the scientific research and development of the QM-1114 biologic product, constitute Ipsen's trade secrets under the Texas Uniform Trade Secrets Act ("TUTSA"), Tex. Civ. Prac. & Rem. Code, § 134A. Over the course of preparing the QM-1114 BLA, GLP came into possession of Ipsen's trade secrets.

53. This information derives independent economic value by not being accessible, through proper means, to competitors who can profit from its use or disclosure. The proprietary information, data, and know-how concerning the QM-1114 contained in the QM-1114 BLA is not readily available to the public.

54. Development of a novel biologic product like QM-1114 for approval in the United States is an extremely expensive and lengthy process. Ipsen has expended significant sums, both in financial and human resources, to support GSA and have the proprietary information protected, which is of great value to any competitor.

55. Ipsen has taken reasonable measures under the circumstances to maintain the secrecy of this information. In particular, the QM Agreement was intended, among other things, to protect trade secrets from unauthorized use or disclosure to any third parties. It includes a clear confidentiality provision preventing GSA from disclosing to any third party the proprietary information, data, and know-how concerning QM-1114.

56. GLP knew or had reason to know that Ipsen considered its proprietary information to be trade secrets.

57. GLP knew or had reason to know that it had obtained Ipsen's trade secrets under circumstances giving rise to an express duty to maintain the secrecy of the trade secrets and limit the use or disclosure of the trade secrets.

58. GLP threatens to imminently misappropriate Ipsen's trade secrets on or around September 2022 by seeking to file a BLA with the FDA, which contains Ipsen's trade secrets, without Ipsen's consent and notwithstanding Ipsen's express withholding of authorization due to concerns over the content of the BLA.

59. GLP's conduct in this manner is both willful and malicious.

60. GLP's unauthorized disclosure of Ipsen's trade secrets to the FDA through the QM-1114 BLA submission will cause irreparable harm to Ipsen, including: the loss of Ipsen's contractual right of control over the QM-1114 BLA, including the timing and scope of the BLA and other communications about it with the FDA; possible adverse decisions from the FDA approval process arising from Ipsen's inability to exercise its right of control over the submission process; the unauthorized use and disclosure of Ipsen's proprietary information, data, and intellectual property for GLP's and GSA's benefit; and the potential of serious reputational harm

and loss of goodwill arising from a possible backlash by the public, customers, and investors against any appearance of a violation of Ipsen's well-publicized policies and practices.

61. GLP's threatened unauthorized disclosure and use of Ipsen's trade secrets warrant injunctive relief under Tex. Civ. Prac. & Rem. Code § 134A.003. On information and belief, GLP's actions may further entitle Ipsen to compensatory damages under § 134A.004(a).

## PRAYER FOR RELIEF

WHEREFORE, based on the allegations set forth above and/or additional facts that will be revealed through discovery, Ipsen requests judgment against GLP and the following relief:

a. a temporary restraining order, preliminary injunction, and/or permanent injunction preventing GLP from seeking FDA approval of the QM-1114 product pending the outcome of the ICC Arbitration Proceeding;

b. a temporary restraining order, preliminary injunction, and/or permanent injunction preventing GLP from participating or aiding in obtaining approval of the QM-1114 product outside of the United States in countries for which Ipsen possesses the corresponding contractual rights pending the outcome of the ICC Arbitration Proceeding;

c. a temporary restraining order, preliminary injunction, and/or permanent injunction preventing GLP from participating or aiding in the authorized use or disclosure of any Ipsen trade secrets or proprietary information;

d. an award of interest, costs, fees and other expenses associated with this action, including reasonable attorneys' fees; and

e. such further and other legal or equitable relief as this Court deems just and proper.

Respectfully submitted,

Dated: August 2, 2022

By: /s/ Scott Wiehle

Of Counsel (*pro hac vice* forthcoming):

Katherine A. Helm
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3500
khelm@dechert.com

Jeffrey S. Edwards
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA
(215) 994-2000
jeffrey.edwards@dechert.com

Pejmon Pashai
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006
(202) 261-3300
pejmon.pashai@dechert.com

Chad Arnette
Texas Bar No. 24014751
Scott Wiehle
Texas Bar No. 24043991
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Tel.: (817) 332-2500
Fax.: (817) 878-9280
chad.arnette@kellyhart.com
scott.wiehle@kellyhart.com

ATTORNEYS FOR PLAINTIFF
IPSEN BIOPHARMA LTD.