UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IPSEN BIOPHARM LTD.,<br><br>        Plaintiff,<br><br>v.<br><br>GALDERMA LABORATORIES, L.P.,<br><br>        Defendant. | CASE NO. 4:22-CV-00662-O |

**DEFENDANT'S MOTION TO DISMISS COMPLAINT FOR INJUNCTIVE RELIEF**

Defendant Galderma Laboratories, L.P. ("Galderma Labs") respectfully asks this Court to dismiss all claims asserted against it by Plaintiff Ipsen Biopharm Ltd. ("Ipsen") on the basis of *forum non conveniens*.

**I.  INTRODUCTION**

Ipsen's case is meritless. But more importantly for purposes of this Motion, it was filed in the wrong forum. As Ipsen's complaint[1] makes clear, this dispute arises out of an agreement between Ipsen, Galderma S.A., and Galderma S.A.'s "Affiliates" (the "QM Agreement"). It is undisputed that Galderma Labs is one of these "Affiliates." And it is undisputed that the QM Agreement contains an arbitration provision subjecting all disputes "arising out of or in connection with" it to arbitration with the International Chamber of Commerce in Brussels, Belgium.

---

[1]  ECF No. 1, "Complaint" or "Comp."

These undisputed facts require dismissal of this case. An arbitration clause "pointing to a foreign tribunal requires *forum non conveniens* dismissal absent unusual circumstances."[2] And no such "unusual circumstances" exist here. To the contrary, Plaintiff concedes that an ICC arbitration is already well underway in Brussels.[3] And, although conspicuously absent from its Complaint, Ipsen has asked the ICC Tribunal for the ***exact same injunctive relief*** requested here.[4] This Court should dismiss the Complaint and allow the parties to continue arbitrating their disputes as they agreed to do under the QM Agreement.

**II.     BACKGROUND**

Galderma Labs is the U.S.-based Affiliate of Galderma S.A.,[5] which develops dermatology products. On July 9, 2014, Galderma S.A. "acting in its own name and on behalf of its Affiliates" entered into the QM Agreement with Ipsen. Ex. A at 1; *see also* Comp. at ¶ 15. The QM Agreement covers "developing, manufacturing, and/or selling QM-1114 (Botulinum Toxin Type A), in various jurisdictions, including the United States." Comp. at ¶ 15.

The QM agreement contains a "Governing Law and Jurisdiction" clause, which reads:

> This Agreement shall be governed by the laws of Belgium. All disputes arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with the said Rules. The seat of arbitration shall be Brussels and the language of arbitration shall be English.

---

[2]   *Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007, 1027 (S.D. Tex. 2018), *aff'd sub nom. Fintech Fund, F.L.P. v. Horne*, 836 F. App'x 215 (5th Cir. 2020) (citing *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568, 581–83 (2013)).

[3]   *See* Comp. at ¶¶ 32, 35.

[4]   *See* Ex. B at 1–2 (Letter from Galderma S.A. to Ipsen, August 3, 2022).

[5]   The QM Agreement defines "Affiliates" as having the "meaning given to it in the Europe DDA," Ex. A at 1, which defines "Affiliate" as owning "50% of the share capital and/or of the voting rights of such a person, corporation or entity." Ex. C at ¶ 70 ("Statement of Claim" excerpt; filed by Galderma S.A. on February 28, 2022, in the ongoing arbitration, ICC Case No. 26409/PAR). Galderma S.A. owns 50% or more of Galderma and is therefore an Affiliate under the QM Agreement. Ex. D at ¶ 3 (Donovan Decl.).

Ex. A at Section 6.5.

During the summer of 2021, the parties reached a disagreement about matters related to applying for regulatory approval of QM-1114 in various jurisdictions, including the United States. *See* Comp. at ¶ 30. Ultimately, Galderma Labs' parent company initiated a request for arbitration before the International Chamber of Commerce ("ICC") in Brussels. Arbitrators were selected in the fourth quarter of 2021, and the arbitration is currently pending, with a final decision expected sometime before September 2023. Comp. at ¶¶ 30, 32, 35.

On July 18, 2022, Ipsen filed a Request for Interim Measures requesting an order that:

> "Galderma . . . refrain from submitting any regulatory filing for QM-1114 in its own name . . . in any of the Territories, including any related action unauthorized by Ipsen in violation of its intellectual property rights, pending the resolution of this arbitration."

Ex. B at ¶¶ 2, 4. Galderma responded by requesting the opposite ruling:

> "Dismiss Ipsen's request and allow Galderma to proceed with the regulatory filings for QM-1114 in Galderma's own name, on a temporary basis, until the outcome of the arbitration is decided . . . ."

*Id.* at 5. The parties conferred with the ICC arbitrators days later, and the arbitrators agreed to issue a decision regarding Ipsen's requested injunctive relief by mid-September 2022, before the at-issue regulatory filings would take place. *See* Ex. B at ¶ 6.

Despite the agreement of the parties and the timetable set by the arbitrators, Ipsen filed this Complaint on August 2, 2022, requesting that this Court grant a temporary restraining order "preventing [Galderma Labs] from seeking FDA approval of the QM-1114 product pending the outcome of the ICC Arbitration Proceeding," as well as other, related relief. Comp. at 13.

In response, on August 3, 2022, Galderma Labs' parent company sent a letter to Ipsen restating the current posture of the arbitration and the timetable set out by the arbitrators. For the

3

avoidance of any doubt, Galderma Lab's parent company included the following stipulation, which it thought had been obvious from the parties' filings before the arbitrators, discussed *supra*:

> [W]e hereby confirm on behalf of Galderma SA and (to the extent necessary) Galderma Laboratories LP that it will not make any filing in respect of QM-1114 with the FDA before the Tribunal has reached its decision on Ipsen's Request for Interim Measures.

Ex. B at ¶ 7.

Galderma Labs now brings this Motion to Dismiss for *Forum Non Conveniens* to put an end to this unnecessary and improper action before it begins.

### III.  LEGAL STANDARD

"[A]rbitration agreements are a specialized kind of forum-selection clause." *Warren v. Federal National Mortgage Association*, 733 F. App'x. 753, 765–66 (5th Cir. 2018) (internal quotations omitted). "The Supreme Court has confirmed that 'the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*.'" *Demond v. Infiniti HR, LLC*, 2018 WL 4145053, at *2 (N.D. Tex. Aug. 30, 2018) (citing *Atl. Marine*, 134 S. Ct. at 580).

"Usually, a court applying the doctrine of *forum non conveniens* must determine whether there is an adequate alternative forum, and, if so, must decide which forum is best suited to the litigation by considering 'a variety of private-and public-interest factors and giving deference to the plaintiff's choice of forum.'" *Demond*, 2018 WL 4145053, at *2 (citing *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 300 (5th Cir. 2016)). However, "***[t]he existence of a mandatory, valid forum-selection clause [] simplifies the analysis*** in two ways: (1) the plaintiff's choice of forum merits no weight because, by contracting for a specific forum, the plaintiff has effectively exercised its 'venue privilege' before a dispute arises, and (2) the private-interest factors weigh entirely in favor of the preselected forum, so that the district court may consider arguments about public-

interest factors only." *Demond*, 2018 WL 4145053, at *2 (emphasis added and quotations omitted).

"Where there is a valid and mandatory forum-selection clause [such as an arbitration clause], the party defying the forum selection clause ***bears the burden of establishing that the public-interest factors 'overwhelmingly disfavor' dismissal***." *Demond*, 2018 WL 4145053, at *2 (emphasis added) (citing *Atl. Marine*, 571 U.S. at 63, 67). Further, "[t]he Supreme Court has repeatedly emphasized that 'a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases.'" *Id*.

IV.     **ARGUMENT**

    A.     **The Arbitration Provision is Mandatory for Galderma Labs and Ipsen.**

The arbitration provision in the QM Agreement is mandatory for both Galderma Labs and Ipsen. The QM Agreement makes clear and the parties agree that Galderma Labs is bound by the QM Agreement.

*First*, the QM Agreement unambiguously states that Galderma S.A. signed the QM Agreement "acting in its own name and on behalf of its Affiliates." There is no dispute that Galderma Labs is an Affiliate of Galderma S.A. *See supra* note 5.

*Second*, Ipsen concedes that Galderma Labs is bound by and subject to the QM Agreement and its arbitration provision throughout its Complaint. For example, Ipsen explains that "***[u]nder the QM Agreement***, neither [Galderma S.A.], [Galderma Labs], nor their affiliates are authorized to seek regulatory approval for the covered QM-1114 products on their own." Comp. at ¶ 18. Further, the temporary relief sought in the Complaint is requested "pending the outcome of the ICC Arbitration Proceeding," which Ipsen concedes would govern Galderma Labs' ability to seek regulatory approval in the United States and elsewhere under the QM Agreement, regardless of which Galderma entity submits the documents necessary for regulatory approval to be granted.

5

Moreover, if the ICC Arbitration Proceeding eventually binds all Galderma affiliates, as Ipsen avers that it will, there can be no opening in the arbitration agreement for this Court to fill.

*Third*, both Galderma and Ipsen are currently engaged in an arbitration pursuant to the QM Agreement, which the parties concede governs the actions of Galderma S.A. and its Affiliates regarding regulatory filings for QM-1114. In fact, pursuant to the letter Galderma sent to Ipsen's counsel discussed above, Galderma S.A. has stipulated that it "and (to the extent necessary) Galderma Laboratories . . . will not make any filing in respect of QM-1114 with the FDA before the [arbitrators] ha[ve] reached [their] decision on Ipsen's Request for Interim Measures." Ex. B at ¶ 7. In the unlikely case that the pending arbitration was found not to fully cover Galderma Labs' conduct—which would fly in the face of the parties' correspondence and filings discussed *supra*—Ipsen is free to pursue additional relief through arbitration under the QM Agreement.

The QM Agreement thus unambiguously states that it covers both Galderma Labs, as an Affiliate of Galderma S.A., and Ipsen. The arbitration provision is mandatory for all parties to the Complaint.

B. **The Arbitration Provision Covers Ipsen's Claims.**

Ipsen's disputes arise out of or are in connection to the QM Agreement and therefore fall within the scope of the arbitration clause. "'In determining whether the forum selection clause applies [to a specific dispute], the court will assume . . . that federal law controls whether [Ipsen's claims] fall[ ] within the scope of the [arbitration] clause.'" *Demond*, 2018 WL 4145053, at *4 (citing *Your Town Yellow Pages, L.L.C. v. Liberty Press*, L.L.C., 2009 WL 3645094, at *3 (N.D. Tex. Nov. 2, 2009)). "The scope of a forum selection clause is not limited solely to claims for breach of the contract that contains it." *MaxEn Capital, LLC v. Sutherland*, 2009 WL 936895, at *6 (S.D. Tex. Apr. 3, 2009). "Whether a forum selection clause encompasses other claims depends principally on how broadly the clause is worded." *Demond*, 2018 WL 4145053, at *4.

"In determining the scope of the forum-selection clause, the court must also look to the operative facts underlying the alleged causes of action . . . . Claims that arise out of the contractual relationship and implicate the agreement are subject to the forum selection clause." *Demond*, 2018 WL 4145053, at *4 (internal citations and quotations omitted).

The arbitration provision in the QM Agreement is broadly worded and covers a broad range of conduct, including "[a]ll disputes arising out of or in connection with" the QM Agreement. Ex. A at Section 6.5.

Both of Ipsen's claims "arise out of the contractual relationship" with Galderma and "implicate" the QM Agreement. *See Fintech Fund*, 327 F. Supp. 3d at 1024, 1027–28 (theft of trade secrets claim covered by broad language of arbitration agreement in CEO's contract with employer). Counts I and II of the Complaint allege misappropriation of trade secrets, which Ipsen defines as the very information and regulatory filings governed by the QM Agreement. Comp. at ¶¶ 39–61; *see also id.* at ¶¶ 18, 19 ("The **QM Agreement provides that** Ipsen owns all regulatory approvals, submissions, and issued certificates, together with all data, information, files developed, gathered, and drafted by Galderma, which includes [Galderma S.A.] and Defendant [Galderma Labs]"), 21 ("To protect **Ipsen's intellectual property rights concerning QM-1114, the QM Agreement provided** that all information related to the agreement and the performance under it would be **kept confidential by the parties**."), 28 ("**Under the QM Agreement, the information, data, and know-how contained in the draft [regulatory filing] belongs to Ipsen and are Ipsen's trade secrets**."), 44 (The "**QM Agreement was intended, among other things, to protect trade secrets** from unauthorized use or disclosure"), 55 (same) (emphasis added).

Equally telling is the relief sought by Ipsen. Ipsen asks this Court to interfere in the regulatory filing process, which Ipsen admits is strictly governed by the QM Agreement, and to

7

prevent Galderma Labs from unauthorized disclosure of the trade secrets or proprietary information conveyed and regulated by the QM Agreement. *See* Comp. at 13, ¶¶ 21, 28, 44, 55. Finally, all of the temporary injunctive relief sought by Ipsen, is conditioned on "the outcome of the ICC Arbitration Proceeding," all but conceding that these issues are for the arbitrators in the ongoing arbitration to decide.

The disputes and claims asserted in the Complaint both arise out of the parties' contractual relationship and implicate the key provisions of the QM Agreement regarding proprietary information and regulatory filings. Therefore, the claims raised by the Complaint are within the scope of the arbitration provision.

> C. **The Arbitration Provision is Enforceable.**

"Federal law governs whether [a] forum-selection clause is binding in this action." *Demond v. Infiniti HR, LLC*, 2018 WL 4145053, at *5–6 (citing *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997)). "Under federal law, forum-selection clauses are ***presumed enforceable, and the party resisting enforcement bears a heavy burden of proof***." *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008) (emphasis added and quotations omitted). "Such clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 Fed.Appx. 612, 615 (5th Cir. 2007) (per curiam) (internal quotations omitted).

> A forum-selection clause may only be considered unreasonable if:
>
> (1) the incorporation of the forum selection clause into the agreement was the product of the fraud or overreaching; (2) the party seeking to escape enforcement "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

*Haynsworth*, 121 F.3d at 963. *See Demond*, 2018 WL 4145053, at *5–6; *Fintech Fund*, 327 F. Supp. 3d at 1027.

Neither party has alleged, nor are there grounds to argue, that the QM Agreement is the product of fraud. Nor could Ipsen meet its heavy burden to argue that dismissal of this action would deprive it of its day in court, when—right now—arbitrators in Brussels are deliberating on the exact issues raised here and have agreed to decide such issues.[6] *See* Ex. B at ¶¶ 2, 4, 6. For the same reason, Ipsen cannot argue that dismissing an action would deprive it of a remedy, where it is clear both that the ICC Rules allow for comparable mechanisms for temporary relief and Ipsen has already sought the same remedies in its Request for Interim Measures pending before the arbitrators. *See* Ex. B at ¶¶ 2, 4.

Finally, Ipsen cannot meet its burden to show that enforcement of the arbitration clause would contravene a strong Texas public policy. *See Demond*, 2018 WL 4145053, at *2 (emphasis added) (citing *Atl. Marine*, 571 U.S. at 67). Both Galderma and Ipsen are sophisticated players in a complex industry, who came together to negotiate a commercial agreement. As part of that negotiation the parties agreed to the arbitration provision. To the extent Texas has a public policy interest in protecting trade secrets, such interest does not override sophisticated parties' right to agree to arbitrate potential disputes. *See Fintech Fund*, 327 F. Supp. 3d at 1027–28 (no compelling public policy under the Defend Trade Secrets Act considered in dismissing a trade secrets case on *forum non conveniens* grounds); *see also Hoffman v. Burroughs Corp.*, 571 F. Supp. 545, 550 (N.D. Tex. 1982) ("[T]o the extent that policies of the Texas DTPA might be implicitly contravened by enforcing a forum selection clause, that policy would be oriented towards

---

[6] To the extent Ipsen claims that any relief sought by the Complaint is not included in its Request for Interim Measures, Ipsen is free to file additional papers under the same procedural posture before the arbitrators.

protecting ordinary consumers, as compared with knowledgeable, experienced businessmen."); *American Intern. v. Res-Care*, 529 F.3d 649, 662 (5th Cir. 2008) ("Texas recognizes a strong public policy in favor of preserving the freedom of contract.") (internal quotations omitted).

Ipsen cannot meet its heavy burden to show that the arbitration clause is unreasonable and therefore the arbitration provision is enforceable.

D. **The Public-Interest Factors Do Not Overwhelmingly Disfavor Dismissal.**

"[F]orum-selection clauses should control except in unusual cases." *See Demond*, 2018 WL 4145053, at *2 (citing *Atl. Marine*, 571 U.S. at 64, 67). Ipsen cannot meet its heavy burden of establishing that the public interest factors overwhelmingly disfavor dismissal. *See id.*, at *2. The public interest factors consist of:

> [1] administrative difficulties flowing from court congestion; [2] the local interest in having localized controversies decided at home; [3] the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; [4] the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and [5] the unfairness of burdening citizens in an unrelated forum with jury duty.

*Barnett*, 831 F.3d at 309.

While the first three and final factors are neutral, it is clear that having this Court engage in this action at the same time that an existing arbitration is ongoing pursuant to the QM Agreement, in which identical issues are being decided under Belgian Law and ICC Rules, would generate unnecessary problems in the conflict of laws.

This case is not "truly exceptional." Rather, it's a simple case. Ipsen's disputes arise out of the QM Agreement and are the ***current*** subject of an ***ongoing*** arbitration in Brussels undertaken pursuant to the arbitration agreement the parties negotiated. Indeed, the arbitrators have agreed to issue a decision regarding Ipsen's requested injunctive relief—the same relief being pursued here—by mid-September 2022, before any regulatory filings would take place. *See* Ex. B at ¶ 6.

That means, by the time briefing is complete on this motion, the arbitrators will have likely already issued a ruling on this matter. Given that Ipsen cannot meet its heavy burden, this Court should dismiss this matter on *forum non conveniens* grounds. Moreover, allowing this action to proceed risks contrary rulings on the same issues from this Court and the arbitrators deliberating in the ongoing arbitration. For example, if this Court were to grant the temporary relief requested by Ipsen, and the arbitrator were to find that Galderma may proceed with the regulatory process in its own name, the parties would be faced with contrary orders requiring lengthy and costly litigation to determine the operative ruling. The parties negotiated the QM Agreement to include the arbitration provision to avoid exactly these issues.

Accordingly, Ipsen cannot meet its heavy burden to establish that the public-interest factors overwhelmingly disfavor dismissal.

## V.     PRAYER

For the foregoing reasons, Galderma Labs respectfully requests that the Court dismiss Plaintiff's Complaint and order any other relief to which it is entitled.

Dated:  August 23, 2022 	Respectfully submitted,

 	*/s/ Jeremy Fielding*
 	Jeremy Fielding
 	Texas Bar No. 17233700
 	Steve Fahey
 	Texas Bar No. 24101249
 	Ruben Alan Garcia
 	Texas Bar No. 24101787
 	KIRKLAND & ELLIS LLP
 	4550 Travis Street
 	Dallas, Texas 75205
 	Telephone: (214) 972-1770
 	Facsimile: (214) 972-1771
 	jeremy.fielding@kirkland.com
 	steve.fahey@kirkland.com
 	ruben.a.garcia@kirkland.com

 	*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served on August 23, 2022 with a copy of this document via the Court's CM/ECF system.

*/s/ Jeremy Fielding*
Jeremy Fielding