IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IPSEN BIOPHARM LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  4:22-cv-00662-O |
| | § | |
| GALDERMA LABORATORIES, L.P., | § | |
| and GALDERMA RESEARCH & | § | |
| DEVELOPMENT, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendants' Motion to Dismiss Complaint for Injunctive Relief (ECF No. 21), filed August 23, 2022. On October 20, 2022, Plaintiff filed its Response (ECF No. 29), and Defendants filed their Reply (ECF No. 34) on November 3, 2022. At the Court's request, Defendants subsequently filed a Supplement to Motion to Dismiss (ECF No. 45) on November 14, 2022.[1] Accordingly, the Motion to Dismiss is now ripe for review. Having considered the briefing and applicable law, the Court finds that the Motion to Dismiss Complaint for Injunctive Relief (ECF No. 21) should be **GRANTED**.

## I. FACTS

In many respects, this case puts the "complex" in complex commercial litigation, given that it involves two multinational bio-pharmaceutical companies suing one another in courts and tribunals across the globe. Bolstered by talented legal teams, the parties have raised nuanced legal

---

[1] On November 8, 2022, Plaintiff filed its Amended Complaint for Injunctive Relief, wherein it named Galderma Research & Development, LLC, as a defendant for the first time and added a new claim for injunctive relief. *See* Am. Compl., ECF No. 36. In their Supplement to Motion to Dismiss, Defendants argue that their Motion to Dismiss is not moot, since it is based on the jurisdictional issue of *forum non conveniens* which is not affected by Plaintiff's addition of a new party and a new claim for injunctive relief. *See* Supp. to Mot. to Dismiss, ECF No. 45. The Court agrees with Defendants.

arguments touching on topics such as civil procedure, international arbitration, contracts, and regulatory law. On a factual level, the parties' briefing is equally thorough, replete with details on everything from bacterial neurotoxins to molecular chemistry to transnational business strategies.[2] Yet despite this dispute's byzantine trappings, the pertinent factual backdrop for Defendants' Motion to Dismiss can be distilled to five main categories: the QM Agreement, the ICC Arbitration, the Tribunal's Interim Procedural Order No. 3, Galderma's QM License Application to the FDA, and Galderma Affiliates Consent to Arbitration.

**A. QM Agreement**

Ipsen Biopharm Ltd. ("Ipsen") is a bio-pharmaceutical company that has partnered with another bio-pharmaceutical company Galderma S.A. ("Galderma") since 2007. Galderma is the parent company of Galderma Laboratories, L.P. ("Galderma Labs") and Galderma Research & Development, LLC ("Galderma R&D"). Galderma Labs and Galderma R&D are now both parties to this litigation, but their parent company Galderma is not.

Beginning almost a decade ago, Ipsen and Galderma partnered to develop QM-1114, a Botox®-like drug used primarily for cosmetic purposes. In 2014, this partnership was memorialized through the QM Agreement. The QM Agreement applies to Ipsen and its Affiliates and Galderma and its Affiliates. The QM Agreement specifies, "For this Agreement, 'Affiliates' has the meaning given to it in the Europe DDA."[3] At present, the parties dispute whether Galderma Labs and Galderma R&D are "Affiliates" of Galderma, and thus subject to the terms of the QM Agreement.

---

[2] Unless otherwise specified, the Court's recitation of the facts is drawn from Defendants' Motion to Dismiss, Plaintiff's Response, Defendants' Reply, and Defendants' Supplement to Motion to Dismiss. *See* Mot. to Dismiss, ECF No. 21; Resp., ECF No. 29; Reply, ECF No. 34; and Supp. to Mot. to Dismiss, ECF No. 45.
[3] QM Agreement 1, ECF No. 22-1 at 2.

Among other sections outlining the terms of the partnership between Ipsen and Galderma, the QM Agreement included the following dispute resolution provision:

> This Agreement shall be governed by the laws of Belgium. All disputes arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with the said Rules. The seat of arbitration shall be Brussels and the language of arbitration shall be English.[4]

Ultimately, while the parties tried to build a lasting relationship through the QM Agreement that was more than skin-deep, they could not prevent discord from breaking out.

**B. ICC Arbitration**

In the summer of 2021, the Ipsen-Galderma relationship hit a rough patch, as often occurs in long-term partnerships. The trouble first arose with a quarrel about the regulatory submission strategy for QM-1114. But as the situation developed, it became clear that the issues between them were more than merely cosmetic. To resolve these disagreements, the unhappy duo decided to settle their differences in court. More precisely, Galderma initiated an arbitration before the International Chamber of Commerce ("ICC") in Brussels, Belgium pursuant to the dispute resolution provision of the QM Agreement. This ICC Arbitration is still ongoing.

About a year after the initiation of the ICC Arbitration, Galderma and Galderma Labs informed Ipsen that they intended to move forward with submitting regulatory applications for QM-1114. Ipsen considered this proposed course of action to be a violation of the QM Agreement, subversive of the ICC Arbitration, and a threat to Ipsen's trade secrets. In response, Ipsen filed a request for interim relief from the ICC Tribunal. Seeking similar relief, Ipsen also filed this lawsuit on August 2, 2023.

---

[4] QM Agreement § 6.5, ECF No. 22-1 at 3.

## C. Tribunal's Interim Procedural Order No. 3

As just mentioned, Ipsen requested that the ICC Tribunal impose an interim order barring Galderma and Galderma Labs from submitting regulatory applications for QM-1114 while the ICC Arbitration is pending. In response, Galderma also requested interim orders from the ICC Tribunal that would grant it permission to file QM-1114 regulatory applications and that would require Ipsen to withdraw its Complaint before this Court.

The ICC Tribunal issued Procedural Order No. 3 addressing these requests for interim relief on September 9, 2022. According to their briefing, both sides seem to think that Procedural Order No. 3 was decided in their favor. Moreover, the Court has struggled to determine which side is correct since neither submitted a complete version of Procedural Order No. 3 for the Court's review. Instead, both sides have only submitted portions of Procedural Order No. 3, quite literally cherry-picking the sections that support their positions.[5]

Nevertheless, having reviewed the record, it is clear to the Court that the ICC Tribunal denied both Ipsen's and Galderma's requests for interim relief. This decision largely rests on the fact that ICC Tribunal's jurisdiction over all Galderma Affiliates, including Galderma Labs, remains uncertain. Referring to Galderma Labs as GLP, the Tribunal noted:

> GLP is indeed not a party to the present arbitration. Moreover, whether or not "Affiliates" of the Parties (as determined in the QM Agreement) are bound by the Agreement and its arbitration clause, is a question to be determined later in this arbitration. In these circumstances, ordering Ipsen Biopharm to withdraw its complaint against GLP would imply that the Tribunal has jurisdiction or some measure of control over GLP. However, this is not the case.[6]

Ipsen spins this finding as the Tribunal's approval for this lawsuit to continue. Meanwhile, Galderma Labs insists that the instant lawsuit should be dismissed because the Tribunal plans to

---

[5] *Compare* Plaintiff's Procedural Order No. 3, ECF No. 30 at 15–22, *with* Defendants' Procedural Order No. 3, ECF No. 35-2 at 1–6.

[6] Defendants' Procedural Order No. 3 ¶ 116, ECF No. 35-2 at 5.

4

formally consider its status under the QM Agreement at a later date. Importantly, Procedural Order No. 3 also forbids Galderma from breaching the QM Agreement by submitting regulatory filings for QM-1114 in its own name.[7]

### D. Galderma's QM-1114 License Application to the FDA

In late September of 2022, another wrinkle developed. Following the issuance of Procedural Order No. 3, Galderma sought a way to file QM-1114 License Applications despite the ICC Tribunal's directives to the contrary and despite this pending lawsuit. To this end, Galderma tapped one of its subsidiaries, Galderma R&D, to file a License Application for QM-1114 in Galderma's name with the U.S. Food and Drug Administration ("FDA") on September 29, 2022. Galderma justifies this action by noting that Galderma R&D was neither a party to the ICC Arbitration nor this case at the time it filed the QM-1114 License Application. Ipsen forcefully objects to Galderma R&D's QM-1114 License Application, arguing that it usurps the jurisdiction of the ICC Tribunal for a Galderma Affiliate to take an action that Galderma itself is explicitly forbidden from doing, especially when the status of Galderma Affiliates remains an open question before the ICC Tribunal.

In response to Galderma R&D's QM-1114 License Application, Ipsen took three actions. First, Ipsen filed another request for interim relief with the ICC. The ICC Tribunal again declined to order interim relief, and instead determined that the new developments should be taken up in the course of the agreed timetable for the ICC Arbitration.[8] Second, Ipsen filed its Amended Complaint for Injunctive relief which added Galderma R&D as a party to this lawsuit for the first time and added new requests for injunctive relief relating to Galderma R&D's QM-1114 License

---

[7] Plaintiff's Procedural Order No. 3 ¶ 103, ECF No. 30 at 18–19.
[8] Oct. 12, 2022 Email from ICC Tribunal, ECF No. 35-3.

Application.[9] And third, Ipsen filed its Motion for Preliminary Injunction which remains pending before this Court.[10]

**E. Galderma Affiliates Consent to Arbitration**

As of October 20, 2022, neither Galderma Labs nor Galderma R&D had consented to the jurisdiction of the ICC Tribunal, according to Ipsen. However, on November 12, 2022, counsel for Defendants sent a letter to Ipsen consenting to the jurisdiction of the ICC Tribunal over Galderma Labs and Galderma R&D.[11] As Defendants frame it, their consent to the ICC Tribunal's jurisdiction allows the Court to freeze this dispute in place and send the parties on their way, without the need for any more intensive procedures. Ipsen has not accepted Defendants' consent to the ICC Tribunal's jurisdiction at this time.

\*      \*      \*

Although the Court's recitation of the facts is extensive, it is still necessarily abridged. Because of this, the Court finds the need to emphasize one further fact about the overall tenor of this dispute, which is relevant to its disposition, but may not otherwise be apparent. Namely, neither party comes before the Court with perfectly clean hands. By this, the Court means that the parties have scrupulously abided by the letter of the law, but not always the spirit of the law.

Notably, Ipsen has regularly contradicted itself by adopting inconsistent positions throughout its ocean-spanning disputes with the Galderma family of companies. Likewise, Galderma and its Affiliates have done the same. For example, Ipsen now contends that its claims should not be dismissed under the doctrine of *forum non conveniens* because this Court is the only available forum where it can seek relief. But while this case has been pending, Ipsen has twice

---

[9] Am. Compl., ECF No. 36.
[10] Mot. for Prelim. Inj., ECF No. 38.
[11] November 12, 2022 Kirkland & Ellis Letter on Consent to Arbitration, ECF No. 45-2.

sought the same interim relief from the ICC Tribunal. Similarly, Defendants insist that this case should be dismissed under the doctrine of *forum non conveniens* because they are subject to the ICC Arbitration as "Affiliates" of Galderma under the QM Agreement. But Galderma R&D previously filed its QM-1114 License Application with the FDA under the pretense that—as a non-party to the ICC arbitration—it was not bound by Procedural Order No. 3 which forbids Galderma from submitting a QM-1114 License Application.

Even the parties' disagreement about consenting to arbitration bears an air of chicanery. Before the issuance of Procedural Order No. 3, Ipsen advocated for the ICC Tribunal's jurisdiction over Galderma Affiliates and presumably would have gladly accepted Defendants' consent to jurisdiction at that time, had the Defendants then offered such a stipulation. But Defendants only offered to consent to the ICC Tribunal's jurisdiction after the ICC Tribunal released Procedural Order No. 3, after Galderma R&D filed the QM-1114 License Application, and after the ICC Tribunal affirmed that it would not deviate from the agreed upon schedule of proceedings to award interim relief in the ICC Arbitration. Indeed, the Kirkland & Ellis Letter on Consent to Arbitration is dated four days after Ipsen moved for a preliminary injunction from this Court.[12] Put simply, Defendants withheld their consent to arbitration when the ambiguity of the ICC Tribunal's jurisdiction over Galderma Affiliates suited their interests, but now that a prospective order from this Court is the only obstacle to their pending QM-1114 License Application, they seek to vacate this forum in favor of the ICC Arbitration. No doubt recognizing Defendants' maneuvering, Ipsen now withholds its agreement to Defendants' proposed consent to jurisdiction, even though that resistance contradicts its previously articulated desire for the ICC Tribunal to exercise jurisdiction over the Galderma Affiliates.

---

[12] Kirkland & Ellis Letter on Consent to Arbitration, ECF No. 45-2.

Perhaps all this gamesmanship is simply zealous advocacy from highly sophisticated litigants. Or perhaps the litigants' erratic posturing merely exemplifies the inevitable perils of parallel and satellite litigation. Whatever the case may be, the Court's job is to call balls and strikes. That necessarily involves recognizing whenever the catcher is framing the pitches.

## II. LEGAL STANDARDS

"In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion (or a *forum non conveniens* motion) must evaluate both the convenience of the parties and various public-interest considerations.[13] Ordinarily, the district court would weigh the relevant factors and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62–63 (2013) (citing 28 U.S.C. § 1404(a)).

In a standard *forum non conveniens analysis*, a district court would begin by considering whether there is "an alternate forum that is both available and adequate." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir. 2000). "If the moving party carries its burden of establishing an alternate forum that is both adequate and available, then the defendant is charged with showing that dismissal is warranted because certain private and public interest factors weigh in favor of dismissal." *McLennan v. Am. Eurocopter Corp*., 245 F.3d 403, 424 (5th Cir. 2001) (citing *Alpine View*, 205 F.3d at 221-22). The private-interest factors are "[t]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining

---

[13] Motions to transfer under 28 U.S.C. § 1404(a) and motions to dismiss under *forum non conveniens* are analyzed in the same way. As the Supreme Court makes clear, "Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 60 (2013). So while the instant case involves a motion to dismiss under *forum non conveniens*, this Court reaches its conclusions by relying on precedent involving both motions to transfer under 28 U.S.C. § 1404(a) and motions to dismiss under *forum non conveniens*.

attendance of willing, witness; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Dickson Marine Inc. v. Panalpina, Inc*., 179 F.3d 331, 342 (5th Cir. 1999) (citing *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 508 (1947)). The public-interest factors are "[t]he administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id*. (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 240 n.6 (1981)).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Atl. Marine*, 571 U.S. at 63 (citing *Stewart Org. v. Ricoh Corp*., 487 U.S. 22, 31 (1988)). "The enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system. For that reason, and because the overarching consideration . . . is whether a transfer would promote the interest of justice, a valid forum-selection clause should be given controlling weight in all but the most exceptional cases." *Id*. (cleaned up) (citing *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring)).

The presence of a valid forum-selection clause requires district courts to adjust their usual *forum non conveniens* analysis in three ways. *Atl. Marine*, 571 U.S. at 63. "First, the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id*. Second, a court evaluating a motion to dismiss for *forum non conveniens* based

on a forum-selection clause "should not consider arguments about the parties' private interests." *Id*. at 64. As the Supreme Court further explained, "When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation. A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id*. And third, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations."[14] *Id*.

Overall, when considering a motion to dismiss under *forum non conveniens* pursuant to a forum-selection clause, "a district court may consider arguments about public-interest factors only." *Atl. Marine*, 571 U.S. at 64. And "[b]ecause those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases. Although it is 'conceivable in a particular case' that the district court 'would refuse to transfer a case notwithstanding the counterweight of a forum-selection clause,' such cases will not be common." *Id*. (citing *Stewart*, 487 U.S. at 30–31).

A district court's decision to use the *Atlantic Marine* modified *forum non conveniens* analysis instead of the standard *forum non conveniens* analysis hinges on whether the forum-selection clause at issue is "mandatory, valid, and enforceable." *Al Copeland Invs., L.L.C. v. First Specialty Ins. Corp.*, 884 F.3d 540, 545 (5th Cir. 2018). Importantly, courts must apply a "strong presumption" in favor of enforcing forum-selection clauses. *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 773 (5th Cir. 2016). "The presumption of enforceability may be overcome, however, by

---

[14] This third *Atlantic Marine* variation only applies to motions to transfer under § 1404(a), not motions to dismiss under *forum non conveniens*. Since a motion to dismiss under *forum non conveniens* results in dismissal, not transfer, the question of a court's choice-of-law analysis upon receiving a transferred action is not relevant.

a clear showing that the clause is unreasonable under the circumstances." *Id.* Unreasonableness potentially exists where "(1) the incorporation of the FSC[15] into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the FSC would contravene a strong public policy of the forum state." *Id.* (cleaned up).

## III. ANALYSIS

Despite the Court's best efforts to keep its analysis tight, the parties have injected multiple lines of reasoning into their briefing which the Court must address. The Court begins by addressing the appropriateness of the *forum non conveniens* analysis. The Court then evaluates the forum-selection clause in the QM Agreement to determine if the *Atlantic Marine* modified *forum non conveniens analysis* is warranted. Last, the Court conducts its *forum non conveniens* analysis pursuant to the guidance of *Atlantic Marine*. Ultimately, the Court concludes that the doctrine of *forum non conveniens* demands dismissal of this action.

### A. Forum Non Conveniens is Procedurally Appropriate

The parties dispute whether a motion to dismiss under *forum non conveniens* is the appropriate procedural vehicle to enforce the provisions of the QM Agreement. Defendants argue that their motion is proper, but Plaintiff contends that these issues should be resolved by applying the principles of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") and the Federal Arbitration Act ("FAA"). The Court agrees with Defendants.

---

[15] The Fifth Circuit abbreviated "forum-selection clause" as "FSC" in *Weber. See Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 763 (5th Cir. 2016).

This conclusion is grounded in two clear principles of law. First, as the Supreme Court stated, "An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974). And second, as the Supreme Court has also declared, "[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atl. Marine*, 571 U.S. at 60. Reading these two holdings together, arbitration agreements containing forum-selection clauses should be enforced through the doctrine of *forum non conveniens*.

Simply put, the application of *forum non conveniens* in this case is not in tension with the New York Convention and the FAA. Indeed, Defendants do not contest that the QM Agreement is subject to the New York Convention and the FAA. Instead, Defendants correctly argue that the doctrine of *forum non conveniens* is the proper way to enforce a forum-selection clause, including forum-selection clauses in arbitration agreements subject to the New York Convention and the FAA.

Plaintiff's arguments to the contrary are unavailing. Its arguments against the scope and enforceability of the QM Agreement are misplaced, given that the Court is considering a motion to dismiss under *forum non conveniens* and not a motion to compel arbitration. Similarly, Ipsen fails to distinguish away the controlling effect of not one, but two, Supreme Court cases that directly support Defendants' position.

Therefore, the Court concludes that Defendants' Motion to Dismiss Complaint for Injunctive Relief is procedurally appropriate and the issues it raises are properly presented.

## B. The QM Agreement Contains a Mandatory and Enforceable Forum-Selection Clause

A district court's decision to use the *Atlantic Marine* modified *forum non conveniens* analysis instead of the standard *forum non conveniens* analysis hinges on whether the forum-

selection clause at issue is "mandatory, valid, and enforceable." *Al Copeland Invs., L.L.C. v. First Specialty Ins. Corp.*, 884 F.3d 540, 545 (5th Cir. 2018). When the mandatory nature of a forum section clause is disputed, the Fifth Circuit has considered it separately. *Weber*, 811 F.3d at 768–73. And as a semantic matter, the Fifth Circuit does not distinguish "between validity and enforceability, instead seeming to treat those words as synonyms in the forum-selection clause context." *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 302 (5th Cir. 2016); *see also Al Copeland Invs.*, 884 F.3d at 543 n.2 (citing *Barnett* for the premise that validity and enforceability are synonyms and again declining to clarify or differentiate the terms). Because of this precedent, the Court begins by considering whether that forum-selection clause is mandatory, and then proceeds to analyze whether the forum-selection clause of the QM agreement is enforceable. Because the Court finds the forum-selection clause in the QM Agreement to be both mandatory and enforceable, the Court determines that Defendants' Motion to Dismiss Complaint for Injunctive Relief should be evaluated using the *Atlantic Marine* modified *forum non conveniens* analysis.

1. The Forum-Selection Clause in the QM Agreement is Mandatory

As the Fifth Circuit noted in *Weber*, "Our caselaw recognizes a sharp distinction between mandatory and permissive [forum-selection clauses]," and "[o]nly mandatory clauses justify transfer or dismissal." *Weber*, 811 F.3d at 768. The Fifth Circuit further clarified that a forum-selection clause "is mandatory only if it contains clear language specifying that litigation *must* occur in the specified forum-and language merely indicating that the courts of a particular place 'shall have jurisdiction' (or similar) is insufficient to make [a forum-selection clause] mandatory." *Id.* (emphasis original) (citing *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127 (5th Cir. 1994)). To analyze the forum-selection clause at issue in *Weber*, the Fifth Circuit took a three-step approach: first, it determined "the best possible English-language rendering" of the forum-

selection clause; second, it applied "Texas choice-of-law rules to determine which substantive law governs the interpretation" of the forum-selection clause; and third, it applied the "substantive law to the language of the [forum-selection clause] to decide whether it is mandatory or permissive." *Id*. at 769. This Court follows the same approach.

To begin, the forum-selection clause in the QM Agreement reads as follows:

> This Agreement shall be governed by the laws of Belgium. All disputes arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with the said Rules. The seat of arbitration shall be Brussels and the language of arbitration shall be English.[16]

As for the first prong of *Weber*, there is no need to consider the best English-language translation of the forum-selection clause since it is already written in English. Turning to the second prong of *Weber*, the Fifth Circuit directs, "A federal court sitting in diversity applies the forum state's choice-of-law rules to determine which substantive law will apply." *Weber*, 811 F.3d at 770 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). Since this Court sits in the state of Texas, Texas choice-of-law rules must be applied. "The Supreme Court of Texas has recognized that contractual choice of law provisions should generally be enforced, but has also stated that the parties' freedom to choose what jurisdiction's law will apply is not unlimited." *Barnett*, 831 F.3d at 304 (cleaned up). Notwithstanding the fact that "Ipsen has in no way conceded that its trade secret misappropriation claims against [Galderma Labs] belong in arbitration," Ipsen has admitted that "Belgian law principles" are "the governing law of the QM Agreement."[17] Since neither party has directly challenged the QM Agreement's choice-of-law provision, and since the parties seem to agree that Belgian law governs the QM Agreement, the Court applies the standard presumption under Texas law that the QM Agreement's choice-of-law provision is enforceable.

---

[16] QM Agreement § 6.5, ECF No. 22-1 at 3.
[17] Resp. 12 n.2, 13, ECF No. 29.

Accordingly, Belgian law must guide the Court's substantive analysis of whether the forum-selection clause in the QM Agreement is mandatory or permissive.

Neither party has briefed application of Belgian law to the Court's construction of the QM Agreement's forum-selection clause. In fact, in a footnote on this issue, Ipsen notes that Defendants failed to brief Belgian law, and Ipsen similarly chooses not to broach the topic of Belgian law, believing "that the facts and arguments presented herein are dispositive."[18] Fortunately, the ICC Tribunal has evaluated the QM Agreement under Belgian law, and Procedural Order No. 3 reveals the ICC Tribunal's analysis.

In a section titled "Further Observations," the ICC Tribunal notes the following:

The denial of all three of Galderma's Additional Requests does not mean that the Tribunal is not concerned by the risks which are created for this arbitral proceeding by the launch of parallel or satellite litigation. *Pursuing the same or similar relief in multiple fora may result in inconsistent decisions and should be avoided at all cost.*

*The Parties are expected throughout these proceedings to avoid any conduct that will aggravate the dispute or undermine the arbitration.* In particular Ipsen's failure to disclose to the Texas Court that it had already applied to this Tribunal for interim measures may be understood as an attempt to pre-empt this Tribunal's decisions.

In any event, a multiplication of actions before domestic courts in different Territories can only aggravate the dispute. The partnership which the Parties have acknowledged to exist between them, obliges them to cooperate towards common goals and to jointly seek solutions to open questions. Should this not be possible, *they are bound to arbitrate their disputes.*[19]

As these excerpts reveal, the ICC Tribunal does not think that the QM Agreement gives the parties leave to pursue remedies outside of the arbitration in Belgium. Instead, the ICC Tribunal directs the parties to "avoid any conduct that will aggravate the dispute or undermine the arbitration" such as "[p]ursuing the same or similar relief in multiple fora [that] may result in

---

[18] Resp. 12 n.2, ECF No. 29.
[19] Defendants' Procedural Order No. 3 ¶¶ 121–23, ECF No. 35-2 at 6 (emphasis added).

inconsistent decisions."[20] And should there be any doubt remaining, the ICC Tribunal bluntly states that the parties are "bound to arbitrate their disputes."[21] Taken together, the ICC Tribunal construes the QM Agreement to dictate that the ICC Arbitration is the exclusive forum for relief available to the parties as a matter of Belgian law. [22] This Court sees no reason to disagree. Therefore, the Court finds that the forum-selection clause of the QM Agreement is mandatory.

As a final note on this topic, the Court addresses Ipsen's worry that Defendants may not be subject to the QM Agreement. Indeed, this concern animates much of Ipsen's briefing. As Ipsen argues, it faces a plight wherein it might be "relegated to a jurisdictional no man's land, unable to obtain relief in either a court or an arbitration."[23] This fear is both irrelevant and overstated.

Ipsen's fear is irrelevant because this Court is currently considering a motion to dismiss under *forum non conveniens*, not a motion to compel arbitration. Questions about the scope and arbitrability of the QM Agreement are not at issue here.[24] Presently, the Court is exclusively concerned with the meaning of the forum-selection clause of the QM Agreement. And questions about if, and how, the QM Agreement should be applied do not impact the predicate determination of whether its forum-selection clause is mandatory or permissive.

Ipsen's distress is overstated because this Court's holding will not leave it devoid of relief. As the ICC Tribunal has unequivocally stated, "whether or not 'Affiliates' of the Parties (as

---

[20] *Id.*

[21] *Id.*

[22] The ICC Tribunal's harsh stance against parallel or satellite litigation also undercuts Ipsen's argument that it is permitted "to apply to any competent judicial authority for interim or conservatory measures." Resp. 22, ECF No. 29.

[23] Resp. 1–2, ECF No. 29.

[24] Because this is not a motion to compel arbitration, the Court's analysis scrupulously avoids making unnecessary findings which may prejudice the ICC Arbitration. Due to the requirements of binding precedent, the Court unavoidably must make the limited findings that the QM Agreement is governed by Belgian law and that the forum-selection clause of the QM Agreement is mandatory. But any prejudicial impact of the Court's disposition is mitigated since the first of these findings is grounded in the concession of the parties, and the second is based on the ICC Tribunal's own Procedural Order No. 3.

determined in the QM Agreement) are bound by the Agreement and its arbitration clause, is a question to be determined later in this arbitration."[25] Following this Court's decision, the question of the scope of the QM Agreement—and all other questions pertaining to the QM Agreement—will be squarely before the ICC Tribunal, as they should be. Therefore, having addressed Ipsen's objections to the contrary, the Court reaffirms its finding that the forum-selection clause in the QM Agreement is mandatory.

## 2. The Forum-Selection Clause in the QM Agreement is Enforceable

Having determined that the forum-selection clause in the QM Agreement is mandatory, the Court now turns to consider whether it is enforceable. As the Fifth Circuit has repeatedly emphasized, there is a "strong presumption" in favor of enforcing mandatory forum-selection clauses. *Al Copeland*, 884 F.3d at 543; *see also, Weber*, 811 F.3d at 773 (same). "This presumption may be overcome by a clear showing that a forum-selection clause is unreasonable under one of the following circumstances: (1) the incorporation of the forum-selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the clause would contravene a strong public policy of the forum state." *Al Copeland*, 884 F.3d at 543 (cleaned up). The Court's inquiry reveals that none of the four factors counsel in favor of non-enforcement.

On the first factor, neither party contends that the QM Agreement was the product of fraud. On the second factor, both parties will still get their day in court if the forum-selection clause is enforced. In fact, after being apprised of the same factual developments as this Court, the ICC

---

[25] Defendants' Procedural Order No. 3 ¶ 116, ECF No. 35-2 at 5.

Tribunal sent an email "invit[ing] the Parties to address these and possible further developments in their submissions in accordance with the agreed timetable."[26] In other words, the ICC Tribunal has assured the parties that they will have the opportunity to be heard on all their concerns in due time.

Nevertheless, despite this declaration from the ICC Tribunal, Ipsen maintains that the ICC Tribunal is unavailable since it remains an open question whether Galderma Labs and Galderma R&D are subject to the QM Agreement as Galderma Affiliates. Defendants' consent to the jurisdiction of the ICC Arbitration seems to moot this point entirely.[27] And importantly, Ipsen's refusal to accept Defendants' consent to arbitration is irrelevant; Ipsen cannot transform an available forum into an unavailable one by withholding its agreement. But even if the issue somehow remains live, it is a question of contract interpretation that must be left to the arbitral body, and it is one that the ICC Tribunal promises to consider.[28] Thus, the ICC Tribunal is an available forum for all the concerns that Ipsen has raised before this Court. Accordingly, neither of the first two factors indicate that the forum-selection clause should not be enforced.

Looking to the third factor, Ipsen will have the opportunity to receive a remedy when the ICC Tribunal reaches its final decision sometime in September 2023.[29] Granted, this Court's decision today will be the final nail in the coffin for Ipsen's attempt to secure interim injunctive relief against Defendants. But Ipsen already had the chance to request the same injunctive relief

---

[26] Oct. 12, 2022 Email from ICC Tribunal, ECF No. 35-3 at 2.
[27] "In any event, to the extent it was not clear already, we will be crystal clear here: Galderma Laboratories and Galderma R&D hereby confirm that they will abide by any order or Award issued by the Tribunal in the QM Arbitration. If requested, Galderma Laboratories and Galderma R&D would be willing to enter into a binding agreement, containing the same arbitration clause which governs the Galderma/Ipsen relationship in respect of QM-1114, to formalise such undertaking." November 12, 2022 Kirkland & Ellis Letter on Consent to Arbitration ¶ 3, ECF No. 45-2.
[28] Defendants' Procedural Order No. 3 ¶ 116, ECF No. 35-2 at 5.
[29] Am. Compl. ¶ 36, ECF No. 36.

from the ICC Tribunal twice before, and it was denied both times.[30] Simply put, the ability to seek a remedy does not guarantee the right to receive that remedy. And since the ICC Arbitration already provided the litigants with the opportunity for interim relief and it will yet provide some manner of final relief, Ipsen cannot claim to be deprived of all remedies because of the forum-selection provision of the QM Agreement.

Finally, the fourth factor also favors enforcement, since enforcing the forum-selection clause would not contradict Texas public policy. According to the Fifth Circuit, "Texas recognizes a 'strong public policy in favor of preserving the freedom of contract.'" *Am. Int'l Specialty Lines Ins. Co. v. Res-Care Inc.*, 529 F.3d 649, 662 (5th Cir. 2008) (citing *Fairfield Ins. Co. v. Stephens Martin Paving*, *LP*, 246 S.W.3d 653, 664 (Tex. 2008)). In this case, the parties have contracted to arbitrate their disputes before the ICC Tribunal in Belgium. Accordingly, it does not contravene Texas public policy to hold them to their word by enforcing the forum-selection clause they negotiated. On the contrary, ignoring their forum-selection clause and retaining this case would actually contradict the strong public policy of Texas.

Because of the strong presumption in favor of enforcing forum-selection clauses, and because Ipsen has failed to establish by clear evidence that enforcement of the forum-selection clause would be unreasonable, this Court concludes that the forum-selection clause of the QM Agreement is enforceable.

## C. The Forum Non Conveniens Analysis Favors Dismissal

Because the QM Agreement's forum-selection clause is "both mandatory and enforceable, the *Atlantic Marine* private-interest factors strongly favor dismissal." *Weber*, 811 F.3d at 775. At this point, a full *forum non conveniens* analysis is unnecessary as a matter of law, and indeed it

---

[30] Plaintiff's Procedural Order No. 3 ¶ 130, ECF No. 30 at 21 (first denial); Oct. 12, 2022 Email from ICC Tribunal, ECF No. 35-3 (second denial).

would be redundant.[31] "The *only* remaining question is whether this is one of the rare cases in which the public-interest [*forum non conveniens*] factors favor keeping a case despite the existence of a valid and enforceable [forum-selection clause]." *Weber*, 811 F.3d at 775–76 (emphasis and alterations added). Furthermore, rather than evenly balancing the public-interest factors, the Court must determine whether they "so greatly outweigh the private-interest factors as to justify retaining the case in the United Stated despite the parties' agreement." *Id*. at 776. Indeed, the public-interest factors justify refusal to enforce a forum-selection clause only "in truly exceptional cases." *Al Copeland*, 884 F.3d at 545 (internal citation omitted).

> The Fifth Circuit offers guidance on what the Court must consider at this stage:

> The existence of a mandatory, valid and enforceable forum-selection clause means that we afford no weight to plaintiff's choice of forum and consider only the following public-interest factors: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty.

*Id*. The Court reviews each of these five factors in turn.

First, the Court considers its own congestion. Neither party has presented evidence on this factor, and Ipsen cites only one non-precedential case for the proposition that a lack of evidence counsels in favor of dismissal.[32] Due to the lack of caselaw and facts advanced on this point, the Court finds this factor to be neutral.

---

[31] In order to conclude that the QM Agreement's forum-selection clause was mandatory and enforceable, the Court essentially considered whether the ICC Tribunal constituted an available, alternate forum, and whether the parties really made a binding commitment to that forum. Put differently, the Court has already reviewed the same facts that it would evaluate in a standard *forum non conveniens* setting and found them to counsel in favor of dismissal.

[32] Resp. 19, ECF No. 29.

Second, the Court considers the local interest in having this controversy decided in Texas. On this factor, Ipsen correctly identifies that Texas has an interest in protecting against trade secret misappropriation within its jurisdiction. *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 265 (5th Cir. 2014) (discussing requirements for trade secret misappropriation claims in Texas). In response, Defendants argue that other federal courts have determined that the Texas interest in protecting against trade secret misappropriation does not override the parties' freedom to contract for alternate dispute resolution procedures. *See Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007, 1026–28 (dismissing a trade secrets case on *forum non conveniens* grounds despite alleged violations of the federal Defend Trade Secrets Act); *see also Hoffman v. Burroughs Corp*., 571 F. Supp. 545, 550 (N.D. Tex. 1982) ("[T]o the extent that policies of the Texas [Deceptive Trade Practices Act] might be implicitly contravened by enforcing a forum selection clause, that policy would be oriented towards protecting ordinary consumers, as compared with knowledgeable, experienced businessmen."). The Court is persuaded by Defendants' arguments. Accordingly, the Court finds this second factor favors dismissal.

The third factor turns on what source of law must govern this dispute. Ipsen insists that the dispute should be resolved under American arbitration and trade secrets laws, while Defendants contend that Belgian law must govern the dispute. The parties' disparate positions are guided by their opinions on whether the QM Agreement controls this dispute, which is a crucial threshold question that must be resolved before any relief can be administered. And, as the Court has already discussed, the QM Agreement contains a choice-of-law provision which dictates that disputes arising under it must be settled according to Belgian law. As such, if this Court retained jurisdiction, it would need to analyze the QM Agreement under Belgian law to determine the

contract's scope and enforceability.[33] This would be a far worse option than allowing the Belgian ICC Tribunal to construe the QM Agreement under Belgian law. Therefore, the third factor strongly favors dismissal.

The fourth factor is quite similar to the third, and the parties' positions are consistent between the two. As just mentioned, this dispute may be entirely governed by Belgian law, and even if American law retained some applicability to this lawsuit, the Court would need to analyze the QM Agreement under Belgian law to reach that conclusion. Furthermore, the ICC Tribunal has repeatedly declined to award interim relief to either side in this case.[34] This means that the Court cannot award either party injunctive relief without disturbing the ICC Tribunal's decisions. As the ICC Tribunal puts it, the very existence of this lawsuit "may be understood as an attempt to pre-empt this Tribunal's decisions."[35] Nor is this Court prepared to give the parties a do-over. Because this Court must try to avoid applying foreign laws and unnecessarily creating a conflict of laws, the fourth public-interest factor strongly favors dismissal.

Finally, the fifth factor involves the burdening of citizens in an unrelated forum with jury duty. Since QM-1114 may someday be marketed throughout the United States, Texas residents may eventually have the chance to purchase the product, and thus they may have an interest in serving as a juror for this matter.[36] But given the proposed nationwide distribution of QM-1114, a Texan would have the same level of interest as any other American. In fact, even European citizens would have a similar interest since QM-1114 is planned for distribution throughout Europe as

---

[33] Once again, the Court emphasizes that it takes no position on the scope or enforceability of the QM Agreement, leaving those issues entirely to the ICC Tribunal.
[34] *See, e.g.*, Plaintiff's Procedural Order No. 3 ¶ 130, ECF No. 30 at 21.
[35] Defendants' Procedural Order No. 3 ¶ 122, ECF No. 35-2 at 6.
[36] Resp. 20, ECF No. 29.

well.[37] So while Texas citizens may have an interest in this dispute, so would citizens in the other prospective forums where this matter might be resolved. Therefore, the fifth factor is neutral.

Because the first and fifth factors are neutral, and because the second, third, and fourth factors favor dismissal, the overall balance of the public-interest factors indicates that dismissal is proper. None of the public-interest factors "so greatly outweigh the private-interest factors as to justify retaining the case in the United Stated despite the parties' agreement." *Weber*, 811 F.3d at 776. In fact, none of the public-interest factors even favor retaining the case. Therefore, the public-interest factors actually support the "strong presumption" for dismissal in this case. *Al Copeland*, 884 F.3d at 543.

## <u>CONCLUSION</u>

To summarize, *forum non conveniens* is the appropriate vehicle to enforce the forum-selection clause of the QM Agreement. Moreover, the forum-selection clause of the QM Agreement is both mandatory and enforceable, so the *Atlantic Marine* modified *forum non conveniens* analysis is warranted. Lastly, having conducted its *forum non conveniens* analysis pursuant to the guidance of *Atlantic Marine*, the Court concludes that this case should be dismissed. Therefore, Defendants' Motion to Dismiss Complaint for Injunctive Relief (ECF No. 21) should be, and is hereby, **GRANTED**. Final Judgment shall issue.

**SO ORDERED** on this **8th day** of **March, 2023**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[37] *Id*. at 7 (discussing "regulatory submissions in Canada, Australia, Europe, and other applicable territories of the partnership").